ROBERTO R. FUERTES y HERMÁN L. GUILLERMETY, apelantes y recurrentes, *v.* ADMINISTRACIÓN DE REGLAMENTOS Y PERMISOS, apelada y recurrida.

*Número:* CE-90-45        *Resuelto:* 30 de junio de 1992

*Belén Bazán González*, abogada de los apelantes; *Gerónimo Lluberas Kells*, abogado del concesionario-promovido.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

La *planificación* ha sido adecuadamente definida como aquel "*mecanismo racional* que esboce las metas, fines y objetivos de la comunidad, evalúe los recursos, potencialidades y los factores limitativos a su logro, y estructure las prioridades necesarias y sus respectivos instrumentos

de ejecución, para la utilización que más se ajuste a los recursos disponibles tanto en el *presente como en el futuro para la más plena satisfaccción de las necesidades colectivas*". (Énfasis suplido.) L.F. Negrón García y T. Hormazábal Hancock, *La Ley de Planificación de Puerto Rico: análisis de política pública*, 38 (Núm. 3) Rev. Jur. U.P.R. 415 (1969).

Al igual que hace veinte (20) años, esa concepción tiene validez hoy. La vida continúa y con ella agravándose los problemas inherentes a nuestros centros urbanos: densidad poblacional, congestión vehicular, escasez de áreas de esparcimiento, falta de estacionamientos, aglomeración y una infraestructura insuficiente. Los organismos gubernamentales a cargo de la planificación no siempre han podido o han sabido evitar estos problemas; otros se han tornado inmanejables. Es como si ocasionalmente olvidáramos honrar el refrán popular —ínsito en toda gestión planificadora— "mejor precaver, que tener que lamentar".

I

El 28 de diciembre de 1987, René Daubón (en adelante Daubón) sometió a la Administración de Reglamentos y Permisos (A.R.Pe.) un anteproyecto y una solicitud de Permiso de Construcción con el propósito de remodelar un edificio antiguo localizado en la Calle Estado, Núm. 713, Miramar, Santurce, y explotarlo bajo el Plan Ocho de Subsidio de Alquiler de Viviendas Federal. Dicho edificio se encontraba ubicado en un distrito de zonificación R–5, sobre un solar de setecientos ochenta (780) metros cuadrados, adquirido por Daubón dos (2) meses antes, el 28 de octubre. Propuso diecinueve (19) unidades de vivienda, cuatro (4) estacionamientos techados, más tres (3) a la interperie.

A.R.Pe. aprobó la solicitud el 4 de enero de 1988. Al conocerla, Roberto R. Fuertes (en adelante Fuertes) —ve-

cino colindante inmediato del edificio— se querelló ante
A.R.Pᴇ. Alegó que el permiso violaba las disposiciones so-
bre densidad poblacional, el número de apartamentos, los
estacionamientos a permitirse y el sistema sanitario y
eléctrico. Otros vecinos también se opusieron. Previa vista,
A.R.Pᴇ. recomendó favorablemente la remodelación. Sin
embargo, como condiciones fijó que se eliminara el aparta-
mento ubicado en el primer piso —para establecer dos (2)
estacionamientos más— y que se proveyera un estaciona-
miento adicional. O sea, se aprobaron en total dieciocho
(18) apartamentos y nueve (9) estacionamientos.

Inconforme, Fuertes apeló a la Junta de Apelaciones so-
bre Construcciones y Lotificaciones (en adelante la Junta).
Luego de unas vistas públicas, la Junta resolvió que no se
le había demostrado la *no-conformidad legal* en cuanto a la
densidad poblacional y estacionamientos. Reconoció que el
número de viviendas a permitirse eran trece (13)
apartamentos. No obstante, al modificar a A.R.Pᴇ., aprobó
inexplicablemente quince (15) apartamentos y ocho (8) es-
tacionamientos —seis (6) en el edificio accesorio y dos (2)
en el patio del edificio principal— y, además, requirió que
se contratara una compañía privada para el recogido de
basura.

Ambas partes pidieron *sin éxito* reconsideración. Acu-
dieron *separadamente* al Tribunal Superior, Sala de San
Juan, el cual se negó a revisar. Contra dicha determina-
ción, *Fuertes* vino ante nos. Expedimos.

## II

■ De inmediato, a modo de paréntesis, una
aclaración. Según indicamos, Daubón no cuestionó ante
nos el dictamen del Tribunal Superior. Le aplica, pues, la
norma firmemente establecida de que un tribunal apela-
tivo se abstendrá de considerar los argumentos de un re-
currido sobre elementos de la sentencia que no le favorecen

cuando éste no ha presentado un recurso de revisión o apelación. *Quintana Martínez v. Valentín*, 99 D.P.R. 255, 257 (1970). Sólo serán examinados cuando su discusión sea con fines meramente defensivos. *Ochoa Fertilizer Corp. v. Seix*, 41 D.P.R. 914, 915 (1931). Por tal razón, *no* evaluaremos ni adjudicaremos los planteamientos de Daubón sobre el recogido de basura y la ausencia de un debido proceso.

En síntesis, Fuertes argumenta que tanto A.R.Pe. como la Junta erraron al calcular la densidad poblacional y el número de viviendas permisibles. Aduce que se excedieron en el por ciento de ocupación autorizado, no se proveyeron estacionamientos suficientes y no procedía otorgar una variación de la reglamentación. A juicio suyo, sólo cabía autorizar once (11) apartamentos. En contra, Daubón expone que se trata de una propiedad no-conforme legal, a la cual debe eximírsele de la reglamentación aplicable. Alude a que el permiso de construcción que se le otorgó no podía ser revocado sin vista previa. Cuestiona la facultad de la Junta para haberle exigido que el recogido de basura sea realizado por una compañía privada. Finalmente sostiene que no se le brindó un debido proceso en las vistas debido a que las personas que presidieron las mismas no estuvieron siempre presentes, y el récord administrativo no incluye expresamente un informe sobre la manera en que se familiarizaron con la prueba. Veamos.

A.R.Pe. determinó que la densidad poblacional a permitirse en la propiedad era de sesenta (60) metros cuadrados por unidad de vivienda. Usó como base un ancho *total* de la

vía de acceso vehicular de doce (12) metros e hizo referencia a la tabla correspondiente.(¹) Igual fórmula siguió la Junta. Fuertes insiste que la densidad poblacional a permitirse deben ser setenta (70) metros cuadrados debido a que el ancho de la superficie de rodaje son siete (7) metros. Daubón no controvierte esa medida. Fuertes argumenta que el ancho de la superficie es lo controlante y no el de la acera, cuando, como sucede en el presente caso, no existe faja de siembra. *Tiene razón.*

■ De la tabla antes transcrita percibimos que la variación en la densidad poblacional a permitirse es en fun ción del ancho de la superficie de rodaje. Ello resulta lógico, pues la densidad poblacional no es otra cosa que la cantidad de personas ubicadas en un lugar en relación con el

---

(¹) La Sec. 11.05(3) del Reglamento de Planificación Núm. 4, Junta de Planificación de Puerto Rico, ed. rev., 14 de enero de 1989, págs. 60–61, dispone:

"3. Casas de apartamientos - Se permitirá una unidad de vivienda básica por cada cien (100) metros cuadrados del área del solar. No obstante, en el caso de solares dando frente a *una vía de acceso vehicular* a éstos, *de diez (10) metros o más de ancho* se permitirá una densidad poblacional mayor a base del ancho de la superficie rodada y de las aceras y de acuerdo con lo siguiente:

| Ancho en Metros | | | | Densidad Poblacional a Permitirse (Metros cuadrados de solar a requerirse por unidad de vivienda básica) |
|---|---|---|---|---|
| Superficie Rodada | Aceras | Faja de Siembra | Total | |
| 7.0 | 1.5 | ninguna | 10 | 70 |
| 8 | 1.5 | ninguna | 11 | 60 |
| 8 | 1.25 | 1.25 | 13 | 60 |
| 11 | 1.5 | ninguna | 14 | 55 |
| 11 | 1.5 | 2.0 | 15 | 55 |
| 14 | 1.5 | ninguna | 17 | 50 |
| 14 | 1.5 | 1.5 | 20 | 50 |

(Énfasis suplido y nota omitida.)

espacio disponible, el cual incluye la cabida del solar *y las áreas adyacentes de acceso.*[2]

A base de una densidad poblacional de setenta (70) metros por unidad de vivienda, el número de viviendas a permitirse sería 11.142.[3] En el caso hipotético de que densidad poblacional permisible fuera sesenta (60) metros cuadrados por unidad de vivienda —según la determinación de la Junta— el número de viviendas sólo sería de 13.0. En tal caso, tendríamos que concluir que erró la Junta al aprobar quince (15) apartamentos, esto es, dos (2) en exceso de lo visualizado en el Reglamento de Planificación.

█ Esta falta de concordancia entre el número de viviendas permitidas por el Reglamento de Planificación y el aprobado por la Junta no queda superada bajo la autoridad de una variación.[4] Esa situación no está aquí presente. Primeramente, la Sec. 82.07 del Reglamento de Planificación Núm. 4, Junta de Planificación de Puerto Rico, ed. rev., 16 de septiembre de 1992, pág. 262, dispone que "[a]l autorizar variaciones[, ] la Junta o la Administración especificará la *naturaleza* y *extensión* de las mismas ...". (Énfasis suplido.) En su resolución, la Junta *no* estableció clara-

---

[2] "Densidad Poblacional - Es la relación que se establece entre el número de familias que se ubican en un solar y el área de ese solar, expresada en términos de familia por unidad de área. Se considera densidad poblacional bruta, si en el cómputo se considera el área total original del solar y es neta si se excluyen *las áreas de calle y demás áreas públicas.* Para proyectos de apartamientos, normalmente, la densidad bruta y neta es la misma." (Énfasis suplido.) Reglamento de Planificación, *supra*, Sec. 2.00(51), pág. 11.

[3] Este cálculo se realiza dividiendo el total de metros cuadrados del solar (780.00) entre la densidad poblacional a permitirse (70 metros cuadrados).

[4] "*Variación* - Autorización para utilizar una propiedad para un uso prohibido por las restricciones impuestas a una zona o distrito y que sólo se concede para evitar perjuicios a una propiedad que, debido a circunstancias extraordinarias, la aplicación estricta de la reglamentación equivaldría a una confiscación de la propiedad. Variación es sinónimo de concesión." (Énfasis suplido.) Reglamento de Planificación Núm. 4, *supra*, Sec. 2.00(148), pág. 21.

mente si a petición de parte o *sua sponte* otorgó una variación, como tampoco su extensión.

En segundo término, la Sec. 82.06 del Reglamento de Planificación Núm. 4, *supra*, pág. 262, es definitivo en cuanto al ámbito de las variaciones que *no* sean de uso:

Otras Variaciones - La Junta o la Administración, cada una en su ámbito jurisdiccional, podrán autorizar variaciones a los requisitos establecidos en este Reglamento para los usos que tolera el distrito. Se tomará en consideración, entre otros, los siguientes:

1. La magnitud de la variación es la necesaria para asegurar la viabilidad del uso permitido y no es viable considerar otras alternativas para salvar el problema presentado.

2. *La variación solicitada no afectará adversamente entre otros, los siguientes factores*:

    a. La disponibilidad de infraestructura

    b. El contexto en el que ubica

    c. El ambiente de la calle

    d. La seguridad y tranquilidad de los vecinos

3. Se logra un desarrollo urbano más compacto.

4. La densidad o intensidad solicitada no lleva convertir el distrito en otro.

5. La variación solicitada es cónsona con los propósitos de la disposición reglamentaria que se solicita sea modificada, así como con la política pública. (Énfasis suplido.)

■ Es obvio, pues, que al formular su reglamento A.R.Pe. sabiamente limitó la concesión de variaciones a situaciones *extraordinarias*. Así lo reconocimos en *A.R.P.E. v. J.A.C.L.*, 124 D.P.R. 858, 862 (1989):

Como regla general se concede una variación para evitar el efecto confiscatorio sobre la propiedad que conllevaría la aplicación rigurosa de un reglamento de zonificación:

.    .    .    .    .    .    .    .

Por la naturaleza del interés público implicado, *las variaciones a los requisitos de zonificación no se favorecen y deben utilizarse selectivamente en aquellas circunstancias en que un propietario demuestre* que las restricciones le causaron un daño particular que no comparte con otros. "Por eso se descartará una variación cuando no haya prueba de que la situación del

dueño sea singular y distinta a la de sus colindantes." (Traducción nuestra.) 3 *Yokley, Zoning Law and Practice* Sec. 21-6, págs. 297–298 (4ta ed. 1979). De lo contrario, *su uso indiscriminado podría destruir todo nuestro esquema de zonificación y cambiar eventualmente las características de un distrito*, planificado originalmente con una infraestructura para ciertos usos. (Énfasis suplido.)

█ La consecución de una mejor calidad de vida colectiva y el desenvolvimiento normal del orden social exigen, en lo posible, que el desarrollo urbano sea ordenado y configurado según las distintas medidas, reglamentos y leyes promulgadas. De ahí la importancia de que las agencias administrativas correspondientes y los tribunales, las pongan en vigor. Ciertamente el caso de autos no ameritaba conceder una variación.

Aparte de lo expuesto, Daubón no demostró la ausencia de alternativas viables para remodelar el edificio cumpliendo con el número de viviendas permitido, según lo exige el reglamento. Precisamente la propia Junta concluyó que una variación afectaba *adversamente* la *infraestructura, el ambiente de la calle*, la *seguridad* y la *tranquilidad de los vecinos*. Según expuso en su resolución, *la Calle Estado es la única en Miramar que* corre en ambas *direcciones*, por lo cual *suele estar congestionada*. Además, *existe escasez de estacionamiento*, pues sólo se *permite estacionar a un lado de la vía*. La Junta también concluyó que el sistema de alcantarillado pluvial y sanitario *no tiene capacidad suficiente, por lo cual se inunda al llover.* Finalmente, *el edificio no cuenta con un área adecuada para disponer de la basura.* Aunque Daubón *acepta estas realidades,* en su alegato se limita a señalar que la responsabilidad por esos problemas no puede recaer sobre él únicamente. El argumento no es persuasivo. El punto determinante *no* es *quién* es responsable de los problemas existentes, sino si la concesión de una variación definitivamente los *agravaría*.

Por último, la norma de la autoinflicción del daño impide otorgarle la variación. *Asoc. Res. Baldrich, Inc. v. J.P. de P.R.*, 118 D.P.R. 759 (1987); *Asoc., C.D. Octubre v. J.A.C.L.*, 116 D.P.R. 326, 334 (1985). Daubón compró el edificio con la clara intención de remodelarlo y obtener unos beneficios bajo unos programas de arrendamiento federal. Antes de adquirirlo debió asegurarse que las leyes y los reglamentos sobre planificación permitían efectuar *todas* las mejoras que tenía vislumbradas para su mayor uso y explotación. Voluntariamente asumió el riesgo. No puede ahora quejarse.

Brindándole el beneficio máximo permisible bajo la fórmula de densidad poblacional, se limitará el permiso a sólo doce (12) apartamentos.[5]

## III

■ La Junta resolvió que "HACE APROXIMADAMENTE 15 AÑOS ATRÁS, EXISTÍAN COMO MÁXIMO 11 APARTAMENTOS". Apéndice del recurso de *certiorari*, pág. 25. Por tal razón, concluyó que no se trata aquí de un edificio *no-conforme legal*[6] *en cuanto a la densidad poblacional y a los estacionamientos.* Daubón alega en contrario, y argumenta que es innecesario cumplir con las disposiciones del Reglamento de Planificación. Tanto él como Fuertes presentaron evidencia ante la Junta.

Coincidimos con la Junta de que *no se demostró la fecha exacta en que existieron dieciocho (18) apartamentos en el edificio.* No pudo probarse si cuando entró en vigor el Reglamento de Planificación Núm. 4, *supra* —13 de agosto de

---

[5] Nuestra decisión se limita a los planteamientos de las partes y a las circunstancias peculiares que presenta esta edificación y la Calle Estado. No lo evaluamos en virtud de otras disposiciones reglamentarias.

[6] "No-Conformidad Legal - Condición o uso de una pertenencia que no está en armonía con las disposiciones de este Reglamento pero que existía legalmente en esa situación a la fecha de vigencia del mismo reglamento." Reglamento de Planificación Núm. 4, *supra*, Sec. 2.01(90), pág. 15.

1955— existían dieciocho (18) apartamentos. Por tal razón, no quedó establecida la no-conformidad legal. Por estar esa determinación basada en evidencia *sustancial*,[7] la respetaremos. *Murphy Bernabe v. Tribunal Superior*, 103 D.P.R. 692 (1975).

## IV

Daubón argumenta que el Permiso de Uso que se le expidió el 4 de enero de 1990 para los quince (15) apartamentos no podía revocársele sin una vista previa debido a que constituía un derecho de propiedad. Invoca *Phi Delta Pi v. Junta Planificación*, 76 D.P.R. 585 (1954). Tampoco tiene razón. Dicho caso no es aplicable. Allí la Fraternidad obtuvo un permiso de construcción del Oficial de Permisos *antes de que la ley se enmendara* y dispusiera que el permiso de uso lo debería autorizar la Junta. Aquí, los Permisos de Construcción y de Uso fueron expedidos *ultra vires*

---

[7] Daubón descansa en una certificación del Departamento de Asuntos del Consumidor (D.A.Co.) de que en sus archivos constan aproximadamente veinte (20) expedientes de unidades de alquiler inscritas desde noviembre de 1946. Sin embargo, la misma no brinda un desglose de las unidades por *año* ni de *cuándo* fueron inscritas.

También ofreció una declaración jurada de Horacio Daubón expositiva de haber visitado a D.A.Co. y constatado la existencia de diecisiete (17) apartamentos desde 1942. En cuanto a la misma, Fuertes expuso haber investigado los expedientes en D.A.Co. y detectado que las unidades inscritas no contienen el número de apartamento que aparece en la declaración jurada. Además, surge que se le abrieron expedientes a las unidades al no poder constatarse si fueron o no consolidadas unas con otras. Es claro, pues, que estos documentos no reflejan necesariamente el número real de unidades existentes ni la fecha exacta en que existieron.

Como evidencia adicional, Daubón sometió unas fotografías que revelan la existencia de dieciocho (18) contadores eléctricos. *No surge la fecha en que fueron tomadas.* Una carta firmada por el Sr. Hermán Guillermety —vecino del lugar por veinte (20) años, y quien expresa que existen·dieciocho (18) apartamentos— está fechada el *8 de febrero de 1989.* No le favorece tampoco una carta del Lcdo. Adolfo Dones de 1949 que consta en los récords de D.A.Co. La misma contiene un lenguaje ambiguo, que no desvirtúa la interpretación razonable de A.R.Pe.

Frente a esta evidencia, la Junta de Apelaciones sobre Construcciones y Lotificaciones posee un Plano Inventario de Obras del 1945, demostrativo de que la propiedad en cuestión era de dos (2) plantas y constaba de seis (6) apartamentos. También A.R.Pe. consideró un antiguo plano de 1945 que revela la existencia de *seis (6) garages y cuartos de servicios sobre los mismos.*

*desde un principio*, en violación al Art. 31 de la Ley Núm. 76 de 24 de junio de 1975 (23 L.P.R.A. sec. 72(c)). La ley dispone que una vez iniciada una apelación ante la Junta, los procedimientos ante A.R.Pᴇ. quedan paralizados. A.R.Pᴇ. emitió erróneamente el *Permiso de Construcción* el 23 de septiembre de 1988, antes de que transcurrieran los treinta (30) días para apelar su resolución. Fuertes apeló en tiempo. La decisión de A.R.Pᴇ. nunca advino final y firme.

Fuertes diligentemente impugnó el *Permiso de Construcción* el 9 de diciembre de 1988. A.R.Pᴇ. incluyó, como controversia a dilucidarse ante la Junta, su validez. Daubón tuvo conocimiento de la apelación y sus fundamentos. No fue sorprendido en su buena fe. No puede ahora alegar haber adquirido en el permiso un derecho de propiedad.[8]

## V

Finalmente, notamos que la Junta aprobó sólo ocho (8) estacionamientos en el proyecto de remodelación. Por las razones anteriormente expuestas, esa determinación tampoco podría constituir una variación. El mínimo de estacionamientos a permitirse en un proyecto de apartamentos de vivienda se precisa según las disposiciones de la Sec. 70.03(17) del Reglamento de Planificación Núm. 4, *supra. Para ello, es necesario conocer el número de dormitorios y los pies cuadrados en cada apartamento.* En su resolución, A.R.Pᴇ. no hizo ninguna determinación al efecto. En vista de nuestra decisión mediante la cual se limitó a doce (12) el número de apartamentos, lo más prudente y sabio es de-

---

[8] En cuanto a un derecho adquirido, en repetidas ocasiones hemos expresado que "la defensa de impedimento en equidad, de ordinario, no procede cuando se trata de la ejecución de la política pública. En *Infante v. Tribl. Examinador de Médicos*, 84 D.P.R. 308, 316 (1961), expresamos al respecto que esta defensa no puede aplicarse en las relaciones del ciudadano para con el Estado *cuando hay de por medio una cuestión de interés público ...*". (Énfasis suplido.) *J.R.T. v. Hosp. de la Concepción*, 114 D.P.R. 372, 382–383 (1983).

volver el caso al foro administrativo para que a la mayor brevedad posible armonice el permiso con lo dispuesto en el citado reglamento, y atienda cualquier otro reclamo válido de las partes.

*Se dictará la sentencia correspondiente.*

Los Jueces Asociados Señores Rebollo López y Fuster Berlingeri no intervinieron. La Juez Asociada Señora Naveira de Rodón se inhibió.