RESOLUCIÓN
A las mociones en auxilio de jurisdicción, a la moción en solicitud de autorización para comparecer como amicus curiae y a los recursos de certiorari en los casos de epígrafe, no ha lugar.

Notifíquese inmediatamente a las partes por teléfono, fax y por la vía ordinaria.

Lo acordó y ordena el Tribunal, y certifica la Secretaria del Tribunal Supremo. El Juez Asociado Señor Martínez Torres emitió un voto de conformidad, al cual se unió el Juez Asociado Señor Kolthoff Caraballo. El Juez Asociado Señor Estrella Martínez emitió un voto particular de conformidad, al cual se unieron el Juez Presidente Señor Hernández Den-ton, la Jueza Asociada Señora Fiol Matta y la Juez Asociada Señora Rodríguez Rodríguez. La Jueza Asociada Señora Pa-bón Chameco emitió un voto particular disidente, al cual se unieron los Jueces Asociados Señor Rivera García y Señor Feliberti Cintrón. La Jueza Asociada Señora Pabón Char-neco y los Jueces Asociados Señores Rivera García y Feli-berti Cintrón declararían “con lugar” la moción en solicitud de autorización para comparecer como amicus curiae.
(Fdo.) Aida Ileana Oquendo Graulau Secretaria del Tribunal Supremo
*722 Voto de Conformidad emitido por el Juez Asociado Señor Martínez Torres, al cual se une el Juez Asociado Señor Kolthoff Caraballo.
En esta ocasión debemos analizar si procede un recurso de injunction para paralizar una obra en la que el permiso de construcción está impugnado ante la Junta Revisora de Permisos y Uso de Terrenos.(1) Como entiendo que procede el injunction, voto conforme con la decisión de este Foro de declarar “no ha lugar” los recursos presentados.
I
La empresa Bioculture Ltd. (Bioculture) se especializa en la crianza de primates, en particular, del macaco cangrejero. Estos primates se venden a empresas de desa-rrollo de nuevas tecnologías en la industria farmacéutica, biomédica y de alimentos. En el 2008 esta compañía se registró en el Departamento de Estado como Bioculture Puerto Rico, Inc., con el fin de comenzar sus operaciones en la Isla.
Con el aval de la Compañía de Fomento Industrial, Bio-culture comenzó a gestionar una serie de permisos para construir sus instalaciones en el barrio Pozo Hondo, en el municipio de Guayama. Para ello, contrató al Ingeniero José A. Mateo Colón. El 19 de diciembre de 2008, la Admi-nistración de Reglamentos y Permisos (A.R.Pe.) le expidió el permiso de construcción número 08CX2-CET-07702 a Bioculture. La construcción del centro de primates co-menzó en febrero de 2009. En reacción a la expedición del *723 permiso, un grupo de residentes del municipio de Gua-yama manifestó su oposición al proyecto.
El 22 de abril de 2009, el demandante Roberto Brito Díaz instó una querella ante A.R.Pe. El 15 de mayo de 2009, esta agencia ordenó la paralización del proyecto, luego de identificar algunas deficiencias en el trámite de la expedición del permiso original. Posteriormente, Biocul-ture presentó una nueva solicitud de permiso el 15 de junio de 2009, esta vez acompañada de un Memorial Explicativo preparado por el ingeniero Germán Torres Berrios. A.R.Pe. aprobó ese nuevo permiso y lo notificó el 18 de junio de 2009.
El 21 de julio de 2009, el señor Brito Díaz y otros pre-sentaron un recurso de revisión oportuno ante la Junta de Apelaciones sobre Construcciones y Lotificaciones (J.A.C.L.). Solicitaron la revocación del permiso que A.R.Pe. expidió a Bioculture y la paralización inmediata de las obras de construcción. En oposición a esa apelación, Bioculture presentó una Solicitud de Desestimación en la que adujo que los apelantes carecían de legitimación activa. La resolución de la controversia se encuentra pen-diente aún en ese organismo.
Por otro lado, el 21 de agosto de 2009, los apelados pre-sentaron ante el Tribunal de Primera Instancia una “Soli-citud de Interdicto Preliminar y/o Permanente y Remedios Provisionales” contra Bioculture, A.R.Pe., la Junta de Ca-lidad Ambiental (J.C.A.), el municipio de Guayama, el in-geniero Mateo Colón y el ingeniero Torres Berrios.
En su solicitud de interdicto, el señor Brito Díaz y otros alegaron que el proyecto de Bioculture se construía en terre-nos reservados para la construcción de una carretera cono-cida como la PR-711. Además, manifestaron que el uso que se le pretende dar al proyecto sería de naturaleza industrial y, por lo tanto, no era cónsono con el uso estipulado para la calificación del área donde iba a ser construido. El predio estaba zonificado como área Rural General (R-G), por lo que se requería una consulta de ubicación al amparo del Regla- *724 mentó Núm. 4 de la Junta de Planificación, aprobado el 11 de enero de 2009.
Por último, indicaron que por el impacto y riesgo signi-ficativo al ambiente que a su juicio representaba el pro-yecto, era necesaria la preparación de una Declaración de Impacto Ambiental, conforme a la Ley sobre Política Pú-blica Ambiental, Ley Núm. 416-2004 (12 L.P.R.A. sec. 8001 et seq.).
Además, el 28 de septiembre de 2009, el señor Brito Díaz y otros presentaron una Solicitud de Interdicto Preli-minar y/o Permanente y Remedios Provisionales Enmen-dada para, entre otras cosas, añadir una acción de acuerdo con el procedimiento especial establecido en el luego dero-gado Art. 28 de la Ley Núm. 76 de 24 de junio de 1975, Ley Orgánica de A.R.Pe., 23 L.P.R.A. sec. 72.
El 23 de diciembre de 2009, el foro primario emitió una sentencia en la que ordenó la paralización inmediata de la construcción del centro de primates. Fundamentó su deci-sión en que la crianza de monos no era urna actividad agrí-cola o agropecuaria, por lo que el uso propuesto no era con-forme a los permitidos para un distrito clasificado como R-G.
En desacuerdo con esa decisión, Bioculture y el Estado apelaron el 27 de enero de 2010. Luego de consolidar am-bos recursos, el foro apelativo intermedio confirmó la deci-sión del Tribunal de Primera Instancia de otorgar el inter-dicto especial establecido en el Art. 28 de la Ley Núm. 76, supra.
Inconformes, Bioculture y el Estado nos solicitan me-diante recursos de certiorari que revoquemos a los foros recurridos y, en consecuencia, dejemos sin efecto el injunction especial.
II
A. En Plaza Las Américas v. N & H, 166 D.P.R. 631, 654 (2005), mencionamos que “[l]a plena validez de los per- *725 misos que concede A.R.Pe. está sujeta a ciertas condiciones”. Precisamente, el Art. 31 de la Ley Núm. 76, supra, 23 L.P.R.A. sec. 72(c), discutido en Plaza Las Amé-ricas, vigente al dilucidarse esta controversia, establecía un plazo de 30 días para instar una apelación ante la J.A.C.L. En particular, el Art. 31 de la Ley Núm. 76, supra, disponía que una vez se presenta el escrito de apelación ante la J.A.C.L. y se notifica, “el organismo o funcionario de cuya actuación se apela, suspenderá todos los procedi-mientos ante sí, relativos a la actuación, determinación, o resolución de la cual se apela”.
Relacionado con lo anterior, precisa recordar que en Fuertes, Guillermety v. A.R.Pe., 130 D.P.R. 971, 981-982 (1992), mencionamos que la expedición de un permiso antes de que transcurran los 30 días que otorga el Art. 31 para apelar la resolución de A.R.Pe. que lo autoriza es ultra vires. Por lo tanto, una vez iniciada una apelación ante la J.A.C.L., los procedimientos ante A.R.Pe. se paralizan. Plaza Las Américas v. N & H, supra, pág. 655, citando a Fuertes, Guillermety v. A.R.Pe., supra, págs. 981-982. En el caso que nos ocupa, Roberto Brito Díaz y otros presentaron una apelación ante la J.A.C.L. dentro del término de 30 días que disponía el Art. 31 de la Ley Núm. 76, supra. Con ello, se suspendió la eficacia del permiso concedido. No es el Tribunal de Primera Instancia el que invalidó el permiso concedido. Su vigencia estaba suspendida por mandato del citado Art. 31 de la Ley Núm. 76. El tribunal se limitó a hacer cumplir ese mandato y evitar una construcción ilegal, como disponía el Art. 28, supra. Por eso me asombra que la disidencia ni tan siquiera mencione el Art. 31.
B. Como marco doctrinal introductorio, es necesario puntualizar que en A.R.Pe. v. Rodríguez, 127 D.P.R. 793, 806-807 (1991), señalamos que la intención del legislador al aprobar el Art. 28 de la Ley Núm. 76, supra, fue crear un procedimiento sumario. En específico, expresamos que el *726 Informe de la Comisión de lo Jurídico de la Cámara de Representantes respecto al R de la C. 1065, Diario de Se-siones, Sesión Ordinaria 1953, Vol. II, T. II, pág. 1520, dis-pone:
El proyecto tiene por finalidad hacer aquellas reformas en la legislación, reglamentación y trámite relacionadas con los per-misos de construcción que la experiencia ha ido señalando es conveniente realizar para aclimatar dicha legislación y regla-mentación a las condiciones reales de Puerto Rico. Se agrega más adelante: “El procedimiento de imponer multas diarias no ha dado resultado efectivo en la práctica para evitar las cons-trucciones clandestinas y en sustitución del mismo en el Pro-yecto se establece un procedimiento especial mediante el cual se podría ordenar la paralización inmediata de obras clandestinas. Dicho procedimiento concede la oportunidad, a colindantes y vecinos que puedan ser afectados, de instar el mismo. Mediante ese procedimiento, a petición jurada ante un juez del Tribunal de Primera Instancia de Puerto Rico de que se está construyendo una obra clandestina e identificando la misma y las personas violadoras, se puede obtener una orden provisional del tribunal dirigida a dichas personas requirién-dolas para que paralicen inmediatamente, bajo apercibimiento de desacato, la obra a que la petición se refiere, hasta tanto se ventile judicialmente su derecho. Se establece el trámite para este nuevo procedimiento el cual es sumamente rápido, econó-mico y en beneficio de ambas partes.
Así, pues, el Art. 28 de la Ley Núm. 76, supra, estableció un “mecanismo estatutario, independiente, especial, suma-rio y limitado [cuyo] propósito es hacer viable, mediante la paralización de usos [y] obras, la efectividad de las leyes y los reglamentos de planificación cuyo cumplimiento A.R.Pe. está obligada a fiscalizar”. Plaza Las Américas v. N & H, supra, pág. 646.
No podemos separar los conceptos construcción y uso. La ley no concibe que se conceda un permiso de construc-ción enajenado del uso que se le va a proporcionar a la edificación construida. Después de todo, nadie construye en el abstracto. Por eso, el derogado Art. 28 de la Ley Núm. 76, supra, se conceptualizó para paralizar “cualquier edifi-
*727 do o uso, hechos o mantenidos en violación de este capítulo o de cualesquiera reglamentos adoptados conforme a la ley y cuya estructuración le haya sido encomendada a la Administración”. (Enfasis suplido.) La intención legisla-tiva fue “establecer un mecanismo sumario rápido, limi-tado a la obtención de órdenes para la paralización inme-diata, provisional o permanente, de obras o usos contrarios a la ley”. (Enfasis suplido.) A.R.Pe. v. Rodríguez, supra, págs. 807-808.
De igual manera, el Art. 28 de la Ley Núm. 76, supra, facultaba al administrador de A.R.Pe., al Secretario de Justicia, vecinos, propietarios u ocupantes perjudicados o que se podrían perjudicar, a instar recursos de interdicto, mandamus, nulidad y cualquiera otra acción adecuada o remedio disponible en ley para impedir, prohibir, anular, vacar, remover o demoler cualquier edificio o uso que se construya o mantenga en violación a la ley de A.R.Pe.(2) A su vez, el artículo reglamentó el aspecto procesal que se tiene que cumplir para que proceda el remedio solicitado.
El procedimiento especial consagrado en el Art. 28, supra, lo podía utilizar una parte legitimada que mediante una petición jurada asegurase que determinada persona realizaba un uso u obra que violaba una ley o reglamento de planificación que a la A.R.Pe. le correspondía fiscalizar. La ley disponía que una vez una parte legitimada invoca este procedimiento, “el tribunal paralizará provisional-mente la obra o uso, y cumplidos los demás requisitos enu-merados en el estatuto, determinará si ha ocurrido la vio-lación alegada. En tal caso, se ordenará la paralización *728 permanente del uso u obra, sujeta a las formas y condicio-nes que especifica el Artículo 28”. Plaza Las Américas v. N & H, supra, pág. 646.
Sin embargo, no debemos olvidar que el procedimiento especial consagrado en el Art. 28 de la Ley Núm. 76, supra, no desplaza la función administrativa, ya que se trata de un mecanismo provisional que requiere de una acción ulterior e independiente para adjudicar finalmente la controversia. Id. Además, ese procedimiento “no está sujet[o] a las normas de jurisdicción primaria ni el agota-miento de remedios administrativos”. íd.
III
Según el Art. 28 de la Ley Núm. 76, supra, la parte que interesare utilizar el remedio dispuesto en ese artículo te-nía que demostrar que estaba afectada por la construcción o uso ilegal. Es decir, tenía que establecer que contaba con legitimación activa para instar el pleito judicial. Ese crite-rio es cónsono con nuestros pronunciamientos en Fund. Surfrider y otros v. A.R.Pe., 178 D.P.R. 563 (2010).
Una lectura detenida de nuestra opinión en Fund. Surfrider y otros v. A.R.Pe., supra, demuestra que la norma de justiciabilidad que recoge la Sec. 4.2 de la Ley de Procedi-miento Administrativo Uniforme, 3 L.P.R.A. sec. 2172, y que interpretamos en ese caso, se fundamenta en la limitación constitucional que tienen los tribunales para atender sola-mente casos y controversias reales. Fund. Surfrider y otros v. A.R.Pe., supra, pág. 574. Señalamos, entonces, que la parte que acude al tribunal tiene que demostrar “un interés sustancial en la controversia porque sufre o sufrirá una le-sión o daño particular que es causado por la acción adminis-trativa que se impugna ...”. íd., pág. 579. Inmediatamente, citando E.L.A. v. Aguayo, 80 D.P.R. 552, 558-559 (1958), reafirmamos la base constitucional de esta regla al afirmar que el requisito procesal indicado asegura que “ ‘re- *729 solv[amos] controversias genuinas surgidas entre partes opuestas que tienen un interés real de obtener un remedio que haya de afectar sus relaciones jurídicas’ Fund. Surfrider y otros v. A.R.Pe., supra, págs. 571-572.
Es por esto que rechazo vehementemente el análisis de Fund. Surfrider y otros v. A.R.Pe., supra, que el hermano Juez Asociado Señor Estrella Martínez realiza en su Voto de conformidad. No se puede concebir el Art. 28 de la Ley Núm. 76, supra, como una llave maestra que permita que cualquier persona obvie los requisitos constitucionales de justiciabilidad y paralice la construcción de obras. La Asamblea Legislativa no tiene la facultad de relevarnos de las limitaciones de justiciabilidad que la Constitución nos impone y que reconocimos en Fund. Surfrider y otros v. A.R.Pe., supra, así como en E.L.A. v. Aguayo, supra. El legislador no puede facultarnos a emitir opiniones consultivas. Por la misma razón, tampoco puede crear una acción judicial que esté divorciada del principio de legiti-mación activa.
Ahora bien, se desprende de nuestros pronunciamientos en Plaza Las Américas v. N & H, supra, pág. 647, que bastaba con que uno de los peticionarios del procedimiento del Art. 28 de la Ley Núm. 76, supra, tuviera legitimación activa para que pudiera solicitar el injunction. Esto tam-bién es consecuente con lo resuelto en Fund. Surfrider y otros v. A.R.Pe., supra.
En este caso, varios vecinos de Guayama figuran como demandantes, junto a la organización People for the Ethical Treatment of Animals (P.E.T.A.). A esta última se le reconoció legitimación activa para demandar porque uno de los recurridos alegó que es miembro de la organización.
A base de los requisitos constitucionales para establecer un caso y controversia, que explicamos en Fund. Surfrider y otros v. A.R.Pe., supra, estas personas y P.E.T.A. no tie-nen legitimación activa para reclamar en el tribunal. Los individuos no establecieron que sufrieron daños reales y específicos debido a la construcción que Bioculture lleva a cabo. Se limitaron a alegar daños a la población general y a *730 especular por la ansiedad y la angustia que supuestamente les provoca el destino de los animales que Bioculture alo-jará en las instalaciones en construcción. Por la misma ra-zón, P.E.T.A. tampoco demostró tener un daño claro, palpable, real, inmediato, preciso, que no sea general, abstracto, hipotético o especulativo. Además, si ninguno de los miem-bros de la organización tiene legitimación activa, la enti-dad tampoco puede demandar a su nombre. Id., págs. 572-573; Col. Ópticos de P.R. v. Vani Visual Center, 124 D.P.R. 559 (1989). Al respecto, P.E.T.A. y la mayoría de los recurridos no se diferencian de la fundación y el "vecino” a quie-nes no le reconocimos legitimación activa en Fund. Surfrider y otros v. A.R.Pe., supra.
Ahora bien, luego de un análisis minucioso de las trans-cripciones de las vistas celebradas ante el foro primario, es forzoso concluir que el Sr. José C. Rodríguez Collazo os-tenta legitimación activa. Su finca colinda en un extremo con la de Bioculture. Transcripción de Vista Evidenciaria de 9 de noviembre de 2009, pág. 78. En particular, este colindante del proyecto testificó que no ha podido vender parte de su propiedad debido a que tres compradores po-tenciales se arrepintieron tras enterarse de la construcción de las instalaciones de Bioculture:
P ... ¿Por qué más usted demandó? Concretamente[, ¿]qu[é] daño le causó a usted la construcción que lleva a cabo ....
R Me causa el daño, que cuando usted me dijo primero, yo desarrollé un proyecto allí ....
PAj[á],
R A la cual yo le pus[e] agua ....
P Unjú.
R Luz, carretera, y tenía tres compradoras] de par de esos solares y cuando escucharon de la cosa esta de los monos, des-pués se me arrepintieron. Y los tengo allí],] mire\,] muertos de la risa.
P Okey. O sea, la razón por [la] cual usted radicó este pleito es porque[,] según usted, usted no pudo vender un desarrollo de vivienda urbano, [¿]esa es su razón[?]
R Sí .... (Enfasis suplido.) Transcripción, supra, págs. 98-100.
*731 Con esta declaración incontrovertida, el señor Rodrí-guez Collazo demostró tener un daño económico claro, real, concreto y específico. Aunque más adelante señaló en el contrainterrogatorio que los edificios de Bioculture, por sí solos, no le molestan (Transcripción, supra, pág. 101), dejó establecido el daño económico que la construcción le causó, sin que la otra parte presentara prueba en contrario. Esa prueba directa, que el juzgador creyó, es suficiente para probar ese daño. Regla 110(D) de Evidencia, 32 L.RR.A. Ap. VI; S.L.G. Rivera Carrasquillo v. A.A.A., 177 D.P.R. 345, 357 (2009); Ramírez Ferrer v. Conagra Foods PR, 175 D.P.R. 799, 811 (2009); Trinidad v. Chade, 153 D.P.R. 280 (2001). Nuestra decisión en Fund. Surfrider y otros v. A.R.Pe., supra, no dejó esa norma sin efecto ni requirió reglas evidenciarías distintas para probar el daño que le da legitimación activa a un reclamante.
Es evidente, entonces, que la norma sentada en Fund. Surfrider y otros v. A.R.Pe., supra, sigue vigente con toda su fuerza. El anuncio de su muerte es una exageración, parafraseando la nota de Mark Twain de mayo de 1897, dirigida al New York Journal. Lo que diferencia este caso es que uno de los reclamantes logró probar un daño real, concreto, inminente y preciso, que no es especulativo, abs-tracto ni generalizado.
Así las cosas, como uno de los recurridos tiene legitima-ción activa, eso era suficiente para emitir el injunction con el objetivo de que Bioculture paralice la construcción hasta que la J.A.C.L., ahora Junta Revisora de Permisos y Uso de Terrenos, dilucide los méritos de la reclamación presen-tada ante su consideración.
Ahora bien, tanto el foro primario como el Tribunal de Apelaciones erraron al dilucidar los méritos del permiso que A.R.Pe. concedió. Es decir, fue desacertado analizar y con-cluir que la clasificación agrícola del uso propuesto para los terrenos de Bioculture no permite la crianza de animales que estén relacionados a la agricultura tradicional. En esta etapa, esa facultad le pertenece exclusivamente a la Junta Revisora de Permisos y Uso de Terrenos. Tampoco está ante *732 nosotros la bondad o el daño que se alegan que el proyecto propuesto puede tener. Lo único que había que dilucidar en el tribunal era si existía una construcción ilegal y si alguien estaba afectado por ella, lo que se probó. Bioculture está construyendo sin un permiso de construcción final. Eso es contrario a la ley. Por ende, procede el injunction para pa-ralizar la construcción hasta que la Junta Revisora resuelva la apelación en los méritos.
Lo anterior no significa que Bioculture queda impedida permanentemente de construir sus instalaciones. Mera-mente se mantiene el injunction hasta que la Junta Revi-sora de Permisos y Uso de Terrenos resuelva. De hecho, si la Junta Revisora y su antecesora, la J.A.C.L., no se hubie-ran tardado dos años en atender este asunto, el injunction habría sido innecesario.
IV
Debido a que la revisión de una sentencia se da contra la decisión y no contra sus fundamentos, voto conforme con la decisión de este Tribunal de declarar “no ha lugar” el recurso de certiorari. SLG Semidey Vázquez v. ASIFAL, 177 D.P.R. 657, 693 (2009); Pérez v. VPH Motor Corp., 152 D.P.R. 475, 487 (2000).
Voto de conformidad emitido por el Juez Asociado Señor Estrella Martínez, al cual se unen el Juez Presidente Señor Hernández Denton y las Juezas Asociadas Seño-ras Fiol Matta y Rodríguez Rodríguez.
Por considerar que existen justificaciones de interés pú-blico que se extienden a las colindancias del proyecto de Bioculture, y por entender que los vecinos y colindantes cumplieron con los requisitos para obtener un remedio especial de paralización, estoy conforme con el resultado al- *733 canzado por este Tribunal al denegar la expedición del auto de certiorari.
I
La corporación Bioculture Mauritius Ltd., entidad orga-nizada al amparo de las leyes de la República de Mauricio, se especializa en la crianza de monos de la especie Macaques Fascicularis (macaco cangrejero). Los primates que suple esta compañía los utilizan empresas de desarrollo de la industria farmacéutica, biomédica y de alimentos. Exa-minemos los serios errores, deficiencias y el patrón de irre-gularidades cometidos por Bioculture Puerto Rico, Inc. (Bioculture) por los cuales diversas agencias de la Rama Ejecutiva emitieron responsablemente el mismo remedio que eventualmente tuvo que adoptar también la Rama Judicial, a saber: la paralización temporera del proyecto de Bioculture.
Con el fin de comenzar operaciones en Puerto Rico, en el 2008, la compañía fue registrada en el Departamento de Estado como Bioculture Puerto Rico, Inc. Ese mismo año la compañía comenzó a gestionar los correspondientes permi-sos para la construcción de sus instalaciones en el barrio Pozo Hondo en el municipio de Guayama (Municipio). Así las cosas, el 19 de diciembre de 2008, la Administración de Reglamentos y Permisos (A.R.Pe.) expidió el permiso de construcción. La construcción comenzó en febrero de 2009.
El 22 de abril de 2009, el Sr. Roberto Brito Díaz pre-sentó una querella ante A.R.Pe. Dicha agencia identificó deficiencias en el trámite de la expedición del permiso original. En consecuencia, ordenó la paralización del proyecto. Más adelante, Bioculture solicitó nuevamente el permiso de construcción, el cual fue otorgado el 18 de junio de 2009. En reacción a la expedición del permiso, un grupo de residentes del Municipio, así como otras organizaciones, manifestaron su oposición al proyecto.
El 21 de julio de 2009, el señor Brito Díaz y otros veci- *734 nos del Municipio presentaron un recurso de apelación ante la Junta de Apelaciones sobre Construcciones y Loti-ficaciones (J.A.C.L.), actual Junta Revisora de Permisos y Uso de Terrenos, según las disposiciones del Art. 28 de la Ley Núm. 76 de 24 de junio de 1975 (23 L.P.R.A. sec. 72) (derogada). Los vecinos solicitaron la revocación del per-miso que expidió A.R.Pe. a Bioculture y la paralización in-mediata de las obras de construcción. En oposición a esta apelación, Bioculture presentó una solicitud de desestima-ción, aduciendo que los allí apelantes carecían de legitima-ción activa. El 14 de septiembre de 2011, Bioculture pre-sentó una moción ante la J.A.C.L. para solicitar que se atendiera el recurso, dado que la resolución de la contro-versia se encuentra aún pendiente en ese organismo.
El 21 de agosto de 2009, los recurridos presentaron ante el Tribunal de Primera Instancia una solicitud de inter-dicto preliminar y remedios provisionales contra Biocul-ture, A.R.Pe., la Junta de Calidad Ambiental, el Municipio de Guayama y la Compañía de Fomento Industrial. Alega-ron que era necesaria una consulta de ubicación al amparo del Reglamento Núm. 4 de la Junta de Planificación, apro-bado el 11 de enero de 2009, ya que el uso del proyecto sería de naturaleza industrial. Por ende, no era cónsono con el uso estipulado para la calificación del área donde iba a ser construido. Además, plantearon que se requería una Declaración de Impacto Ambiental, conforme a la Ley de Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970 (12 L.P.R.A. sec. 1121 et seq.), debido al riesgo signi-ficativo al ambiente que representaba el proyecto. También alegaron que el proyecto de Bioculture se estaba constru-yendo en terrenos reservados para la construcción de una carretera.
Esta solicitud fue enmendada el 28 de septiembre de 2009. Mediante la referida enmienda añadieron una causa de acción de acuerdo con el procedimiento especial que brinda el Art. 28 de la Ley Orgánica de A.R.Pe., supra. Específicamente, argüyeron la posibilidad de daños físicos, *735 emocionales y de salud a los ciudadanos, además de daños a la agricultura y a la biodiversidad de la Sierra de Cayey, el Bosque Carite, incluyendo la Bahía de Jobos.
Lejos de presentar generalidades, entre otros argumen-tos, los demandantes plantearon que: (1) confrontan un pe-ligro ineludible a su seguridad y a varios problemas serios de salud; (2) el hábitat quedaría afectado debido al efecto negativo en la agricultura de la zona y a la biodiversidad del área; (3) existe un potencial daño a cosechas, habida cuenta de que uno de los demandantes es agricultor y su finca de 139 cuerdas colinda con la finca de Bioculture; (4) el proyecto atenta contra la fauna y la flora del área; (5) riesgos de enfermedades infecciosas asociadas a los primates; (6) se trata de un proyecto industrial que ocasionaría ruidos generados por miles de monos enjaulados y que re-sulta perjudicial a las áreas adyacentes; (7) se trata de una operación de más de 100,000 pies cuadrados no compatible con el distrito en cuestión y que provocaría un problema real de salubridad debido a las heces fecales que generan miles de monos confinados; (8) que los monos que Biocul-ture importaría, además de ser omnívoros, no son una es-pecie nativa y no son compatibles con el hábitat natural de Puerto Rico, al no contar con depredadores naturales; (9) el problema de propagación de esta plaga es real en Puerto Rico, al punto que el Gobierno ha tenido que implantar un programa para lidiar con dicha problemática; (10) el pro-yecto se está construyendo en una servidumbre de paso de la Carretera PR-711, y (11) el incumplimiento de la Junta de Calidad Ambiental con el Reglamento sobre Declaracio-nes de Impacto Ambiental.
El 23 de diciembre de 2009, el foro primario dictó una sentencia en la cual ordenó la paralización provisional de la construcción del centro de primates. La decisión estuvo fundamentada en que la crianza de monos no era una ac-tividad agrícola o agropecuaria, por lo que el uso propuesto para el proyecto de Bioculture no estaba conforme a los permitidos para un distrito clasificado como Rural General *736 (R-G) en la reglamentación aplicable. Por ende, resultaba contrario a derecho que se permitiese mediante certifica-ción de A.R.Pe. la construcción del mismo, ya que se reque-ría llevar a cabo una consulta de ubicación. El foro prima-rio, basándose en la prueba presentada, consideró que los recurridos cumplieron con los requisitos del citado Art. 28, por lo que procedía el remedio de interdicto especial que éste provee, el cual es temporero.
Inconformes con el dictamen del Tribunal de Primera Instancia, tanto Bioculture como el Estado Libre Asociado de Puerto Rico (E.L.A.) presentaron sendos recursos de apelación ante el Tribunal de Apelaciones. En éstos, solici-taron la revocación de la sentencia que dictó el foro primario. Ambos recursos fueron consolidados y el foro apelativo intermedio confirmó la determinación del Tribunal de Primera Instancia, ya que procedía en derecho otor-gar el interdicto especial establecido en el Art. 28.
Nuevamente inconformes, Bioculture y el E.L.A. nos so-licitan que se deje sin efecto el dictamen que emitió el Tribunal de Primera Instancia y confirmó el Tribunal de Apelaciones.
II
El caso ante nuestra consideración es uno bajo el Art. 28 de la derogada Ley Núm. 76, que establecía lo siguiente:
El Administrador o el Secretario de Justicia en los casos en los que así se solicite a nombre del Pueblo de Puerto Rico, o de cualquier propietario u ocupante de una propiedad vecina, que resultare o pudiera resultar especialmente perjudicado por cualesquiera de dichas violaciones, además, de los otros reme-dios provistos por ley, podrá entablar recurso de interdicto, mandamus, nulidad o cualquier otra acción adecuada para im-pedir, prohibir, anular, vacar, remover o demoler cualquier edificio construido, o cualquier edificio o uso, hechos o mante-nidos en violación de este capítulo o de cualesquiera reglamen-tos adoptados conforme a la ley y cuya estructuración le haya sido encomendada a la Administración.
*737 (c) Tendrán derecho a presen tar la petición los colindantes y vecinos que pudieren ser afectados por la violación y los fun-cionarios designados por los organismos gubernamentales que insten la acción, así como ingenieros o arquitectos que actúen como proyectistas o inspectores de la obra. (Énfasis nuestro.)
El procedimiento establecido en el mencionado articu-lado ha sido objeto de interpretación en diversas ocasiones por este Tribunal. El Art. 28 de la Ley Núm. 76, supra, autoriza a entablar el interdicto que provee como remedio para impedir el uso de un edificio o pertenencia en viola-ción de la ley o los reglamentos. A.R.P.E. v. Ozores Pérez, 116 D.P.R. 816, 820 (1986). El procedimiento establecido por el Art. 28 es un mecanismo estatutario, independiente, especial, sumario y limitado que permite la paralización de las obras o los usos que violen la ley. Además, hace viable la efectividad de las leyes y los reglamentos que este orga-nismo está obligado a fiscalizar. A.R.Pe. v. Rodríguez, 127 D.P.R. 793, 808 (1991). En A.R.P.E. v. Ozores Pérez, supra, pág. 822, este Tribunal expresó que, en ocasiones, utilizar los procedimientos sumarios que buscan dar la debida pro-tección a la salud y al bienestar público, tal como el esta-blecido en este articulado, no se circunscribe exclusiva-mente a situaciones de emergencia. Además, es menester señalar que este mecanismo no desplaza la función admi-nistrativa, sino que es un mecanismo provisional. Plaza Las Américas v. N & H, 166 D.P.R. 631, 647 (2005).
No podemos perder de perspectiva que en el pasado he-mos descartado el planteamiento de que las doctrinas de jurisdicción primaria y de agotamiento de remedios admi-nistrativos impiden la concesión del remedio sumario del citado Art. 28. La disponibilidad del procedimiento suma-rio establecido en el referido artículo no está supeditada a las normas de jurisdicción primaria ni de agotamiento de remedios administrativos. Véase Mun. de Caguas v. AT & T, 154 D.P.R. 401 (2001).
*738 El procedimiento se puede invocar cuando una parte alega, en petición jurada, que: (1) determinada persona está realizando un uso u obra; (2) dicha conducta viola una ley o un reglamento de planificación, y (3) A.R.Pe. tiene la obligación de velar por el cumplimiento de dicha disposición. Plaza Las Américas v. N & H, supra, pág. 646; A.R.Pe. v. Rivera, 159 D.P.R. 429, 445 (2003). Invocado el procedimiento especial, el tribunal paralizará provisional-mente la obra o el uso, y cumplidos los demás requisitos enumerados en el estatuto, determinará si ha ocurrido la violación alegada. Plaza Las Américas v. N & H, supra, págs. 646-647. De cumplirse con todos los requisitos, el tribunal ordenará la paralización. Id.
El propósito del Art. 28 de la Ley Núm. 76, supra, es proveer un mecanismo sumario rápido, independiente y complementario. A.R.Pe. v. Rodríguez, supra. Además, las órdenes de paralización solicitadas al amparo del procedi-miento especial del Art. 28 son un remedio independiente y diferente del interdicto tradicional. Así, bien, a diferencia del interdicto tradicional, el mecanismo que provee el Art. 28 no surge de la equidad, sino que se debe evaluar según su letra y la jurisprudencia interpretativa. Plaza Las Américas v. N & H, supra, pág. 650; A.R.Pe. v. Rivera, supra, pág. 444; A.R.Pe. v. Rodríguez, supra. De acuerdo con el Art. 28 no se requiere prueba de daños irreparables, sino sólo la determinación de que el demandado ha violado las disposiciones de la ley. A.R.Pe. v. Rivera, supra; Pueblo v. A. Roig, Sucrs., 63 D.RR. 18 (1944).
En el caso ante nuestra consideración, los recurridos lo-graron satisfacer los requisitos del Art. 28 y de su jurispru-dencia interpretativa. Los peticionarios, por su parte, nos invitan a adentrarnos en su corriente de errores, lo que conllevaría pasar por alto los claros y reiterados preceden-tes interpretativos del artículo. Ese ejercicio, o más bien omisión, conllevaría también aplicar una jurisprudencia ajena a la naturaleza de ese procedimiento especial, como lo es el caso Fund. Surfrider y otros v. A.R.Pe., 178 D.P.R. *739 563 (2010). El citado caso atendió la legitimación activa desde el ámbito general del recurso de revisión judicial provisto en la Ley Núm. 170 de 12 de agosto de 1988, se-gún enmendada, conocida como Ley de Procedimiento Ad-ministrativo Uniforme del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 2101 et seq.
No podemos ignorar que nos encontramos ante un pro-cedimiento especial independiente y distinto al tradicional, que no fue objeto de consideración en el citado caso. En Fund. Surfrider y otros v. A.R.Pe., supra, los peticionarios intentaron cuestionar una determinación final de A.R.Pe. en tomo a la aprobación de un proyecto con variaciones a los reglamentos de zonificación. En el caso ante nuestra consideración, no nos encontramos en dicha etapa procesal. Equiparar ambas situaciones constituiría desvir-tuar la naturaleza del procedimiento especial que el propio legislador le adscribió al Art. 28 de la Ley Núm. 76, supra. ¿Por qué utilizar nuestra tinta para alterar los requisitos especiales que el legislador expresamente estableció en el Art. 28 y extender un precedente inexistente al momento de los peticionarios lograr su remedio de paralización? Máxime cuando nos encontramos ante un proyecto que ha sido altamente cuestionado por un informe final prove-niente de la propia rama de gobierno que estableció dicho articulado.
Examinemos la prueba que desfiló ante el foro primario para disipar cualquier duda relacionada a la procedencia del remedio cuestionado.
Los vecinos y colindantes recurridos presentaron el tes-timonio pericial del Prof. Elias Rodríguez, quien evaluó las solicitudes de permisos de construcción de Bioculture, de acuerdo con las normas de planificación aplicables. El pe-rito catalogó la actividad de Bioculture como industrial. Específicamente, destacó que los monos no se utilizan como alimento, fin de la agricultura. El contexto en el que está planteada la crianza de animales no forma parte de una actividad agrícola. Ciertamente, la crianza de los ani- *740 males es para propósitos industriales. Véase Transcripción de la Vista de 30 de noviembre de 2009, págs. 44-46.
El perito Elias Rodríguez coincidió con la preocupación del Departamento de Recursos Naturales y Ambientales al indicar que
... el proyecto propuesto conlleva un efecto detrimental en la bi[od]iversidad de Puerto Rico. Eso no es cualquier persona la que está hablando en esa comunicación. Es la persona que está encargada por ley, el que los puertorriqueños selecciona-ron para que protegiera los recursos naturales y el medi[oa]mbiente. Y [é]l cumpliendo su función ministerial como Secretario de Recursos Naturales, emite una comunica-ción diciendo: “Este proyecto tendrá un efecto detrimental.” Transcripción de la Vista de 30 de noviembre de 2009, págs. 58-59.
Con relación al impacto ambiental real, el referido pe-rito testificó que
[e]l siguiente punto ... es la existencia de la reserva natural de la Bahía de Jobos. Como yo le dije, la reserva natural de la Bahía de Jobo[s f]orma parte del sistema nacional de reserv[a q]ue se utiliza para investigación. Es parte de los acuerdos con los que llegó el Estado Libre Asociado, el gobierno de Puerto Rico con el gobierno federal, cuando se le deleg[ó] hacer cum-plir la ley de zona de manejo zona costanera, Costa Sur Management Act. ... [D]esde la década del '70, el gobierno de Puerto Ric[o s]e comprometió [a] hacer cumplir ... dicha disposición. El gobierno de Puerto Rico estableció un plan de manejo de la zona costanera.
R Por lo tanto, esto es un recurso que está identificado, que tiene una reserva natural que es de alto valor ecológico, de alta importancia para el país, proteger sus recursos. Y él[,] por si solo, repito lo que dice ... el AP del reglamento: “Cualquier acción que puede impactar significativamente un área donde exista[n] recursos naturales, es de importancia.”

P ¿Y cómo esta acción puede impactar entonces la Reserva de la Bahía Jobos?

La va a contaminar.

P ¿Cómo?

R La va a contaminar con los químicos, con los residuos, ... con los fecales de los monos, etcétera, que va a estar depositán-dose sobre el terreno y cuando llueva, la lluvia va a lavar el *741 terreno o se van a estar depositando ... infiltrfájndose a ese acuífero, y el acuífero va a descargar, parte del acuífero va ... descargando a la reserva, al Río Seco termina en el área de la Bahía de Jobos. Es el único tributario, el único río que desem-boca en la Bahía de Jobos. Así lo reconoce el plan de manejo de la reserva de la Bahía de Jobos.

P ¿Y qué relación tiene el Río Seco con la propiedad de Bio-culture?

La propiedad de Bioculture está dentro de la cuenca geográ-fica del Río Seco. La cuenca geográfica es el área superficial de terreno donde la lluvia que cae, termina en el cauce de ese río. (Enfasis suplido.) Transcripción de la Vista de 30 de noviem-bre de 2009, págs. 59-61.
Las aguas usadas que pretende utilizar Bioculture tam-bién fueron objeto de señalamientos por el perito de los recurridos al testificar lo siguiente:
Aquí el acuífero se va a ver afectado. Y se ve afectado de igual forma. Se ve afectado por los contaminantes que van a llegar al acuífero. Acuérdese que ellos dicen en el memorial explica-tivo ... que de los cuarenta mil (40,000) galones de agua diaria que ellos van a utilizar se espera que treinta mil (30,000) de ellos sean aguas usadas. Van a generar treinta mil (30,000) galones diarios en aguas usadas. Esas aguas usadas se van a manejar a través de pozos filtrantes que van a filtrar las aguas al terreno y de ahí se infiltra a subsuelo, al acuífero con el potencial obviamente de contaminarlo. (Enfasis suplido.) Transcripción de la Vista de 30 de noviembre de 2009, págs. 63-64.
Por último, el perito testificó también con relación al impacto en las utilidades públicas, el aspecto de la servi-dumbre de paso de la carretera, los recursos arqueológicos existentes y los riesgos de escape de los monos.
De la transcripción de la vista evidenciaría surge clara-mente que los demandantes demostraron ser vecinos y co-lindantes a quienes el proyecto podría afectar. Al así de-mostrarlo cumplieron con el requisito del Art. 28 de la Ley Núm. 76, supra, el cual, como mencionamos, concede legi-timación a vecinos y colindantes que pudieran verse afectados. En específico, el señor Brito Díaz testificó que vive desde hace trece años en el barrio Pueblito del Car *742 men, el cual queda cerca del proyecto. Véase Transcripción de la Vista de 9 de noviembre de 2009, pág. 63. De igual forma, el Sr. Ángel L. Sanabria Morales testificó ser legis-lador municipal(1) y residente del barrio Pueblito del Carmen. íd., págs. 66-67.
Por su parte, el Sr. José Rodríguez Collazo testificó que es agricultor y dueño de una finca de ciento treinta y nueve cuerdas en el mencionado barrio Pueblito del Carmen en dónde vive hace quince años. Véase Transcripción de la Vista de 9 de noviembre de 2009, págs. 68-69. Fue estipu-lado que la mencionada finca colinda con el proyecto de Bioculture. Id. págs. 73-75. El señor Rodríguez Collazo, a preguntas de uno de los representantes legales de Biocul-ture, testificó acerca de cómo lo afecta el proyecto. Especí-ficamente, expresó que desarrolló un proyecto de viviendas en la finca colindante a la de Bioculture. A ese proyecto que desarrolló le puso agua y luz. Además, construyó una carretera. Tenía tres compradores, pero cuando éstos escu-charon del proyecto de los monos, se arrepintieron. Trans-cripción de la Vista de 9 de noviembre de 2009, págs. 99-100.
Así, también, el señor Rodríguez Collazo testificó que tenía planes para continuar desarrollando el resto de su finca, mediante la construcción de una hacienda, pero que debido a la situación con Bioculture lo ha detenido. Trans-cripción de la Vista de 9 de noviembre de 2009, pág. 100.
Otro testigo, el Sr. José Enrique Cruz Mercado, testificó que ha sido residente del barrio Pueblito del Carmen por toda su vida, y que su residencia queda cerca del proyecto de Bioculture. Transcripción de la Vista de 9 de noviembre de 2009, pág. 108. De igual forma, la Sra. Lydia Luz Rivera Laporte expresó en la vista que es residente del barrio Pue-blito del Carmen y que el proyecto estaba aproximada-mente a nueve minutos de su parcela. Id., págs. 111-112. *743 La Sra. Margarita Palou Morales también testificó ser re-sidente de Pueblito del Carmen y que el proyecto estaba a una distancia de cinco minutos de su residencia. íd., págs. 113-114. Como vemos, la prueba testifical de la vista evi-denciaría logró establecer la posibilidad de que los vecinos y colindantes se vieran afectados. Reiteradamente hemos establecido que ante la ausencia de indicio alguno de que el Tribunal de Primera Instancia incurrió en error mani-fiesto, prejuicio, parcialidad o pasión al apreciar la eviden-cia desfilada, no intervendremos con la evaluación de la prueba que realizó el foro primario. López Fantauzzi v. 100% Natural, 181 D.P.R. 92 (2011); Rivera Pérez v. Cruz Corchado, 119 D.P.R. 8 (1987); Rodríguez Cancel v. A.E.E., 116 D.P.R. 443 (1985).
La prueba presentada ante el Tribunal de Primera Ins-tancia y que el juzgador creyó demostró que los vecinos cumplieron con los requisitos del Art. 28 de la Ley Núm. 76, supra. Más importante aún, para fines del procedi-miento especial del Art. 28 quedaron demostradas las vio-laciones a la reglamentación de planificación. Los terrenos en los que Bioculture pretende establecer su laboratorio industrial están clasificados como R-G, uno esencialmente agrícola. En consecuencia, los usos a ser permitidos en el distrito clasificado como R-G deben ser compatibles con sus propósitos.
No nos encontramos ante un proyecto agrícola. El 15 de mayo de 2009, la propia A.R.Pe. paralizó el proyecto de Bioculture “por entender que el proyecto conllevaría un la-boratorio de investigación con primates ...”. (Enfasis nuestro.) Véase Informe Final de la Comisión de Recursos Naturales y Ambientales del Senado de Puerto Rico sobre la R. del S. 513 de 10 de noviembre de 2009, 16ta Asamblea Legislativa, 2da Sesión Ordinaria, pág. 9. La solicitud de la propia Bioculture, ante el Departamento de Agricultura, confirma la incompatibilidad de su fin primario con los primates al exponer que “se dedicará a la crianza, reproduc-ción y exportación de animales (SPF Gynos) y ala realiza- *744 ción de proyectos de investigación en el campo de la biomedicina”.
Ante semejante cuadro, el Tribunal de Primera Instan-cia resolvió conforme a derecho al conceder el remedio pro-visto por el citado Art. 28.
Mientras tanto, siguen pasando los meses y la Junta Revisora ha optado por no actuar a la ligera, emulando al Tribunal de Apelaciones. Es su decisión, y no nuestra fun-ción, intervenir en esta etapa en su raciocinio. Ahora bien, mientras la Junta Revisora de Permisos y Uso de Terrenos emite su dictamen, es nuestro deber proteger el interés público y sostener el remedio temporero que concedió el foro primario y confirmó el Tribunal de Apelaciones.
Las acciones de paralización y de fiscalización responsa-ble de las propias agencias administrativas del Gobierno de Puerto Rico, me mueven a ser cauteloso a la hora de permitir la introducción de una colonia de miles de primates que podrían causar serios problemas a la agricultura, a la seguridad y a las propiedades, tal como ha surgido en el pasado en el litoral suroeste de Puerto Rico. Es el propio Gobierno que ha paralizado inicialmente dicho proyecto.
A modo de ejemplo, el 28 de abril de 2009, el Departa-mento de Recursos Naturales y Ambientales presentó una solicitud de investigación de querella bajo el número de caso 09CQ4-00000-01016 ante A.R.Pe. por la construcción de estructuras para una alegada crianza de animales sin permiso. El 15 de mayo de 2009, la A.R.Pe. inspeccionó la propiedad y encontró que el proyecto se encontraba en construcción. La agencia, responsablemente, lo paralizó. De igual forma, el 17 de julio de 2009, la Junta de Calidad Ambiental inspeccionó el área del proyecto, y el 29 y 30 de julio emitió dos Notificaciones por Violación a Bioculture, relacionadas con el Reglamento para el Control de los Des-perdicios Fecales de Animales; el Reglamento de Manejo de Desperdicios Sólidos No Peligrosos, y el Reglamento para el Control de la Inyección Subterránea. Véase Informe Final de la Comisión de Recursos Naturales y Ambientales *745 del Senado de Puerto Rico sobre la R. del S. 513. Estos reglamentos inciden en las preocupaciones de salud, am-biente y seguridad que precisamente trajeron a la atención del Tribunal de Primera Instancia los colindantes y vecinos recurridos.
Ante la seriedad del cuadro de deficiencias e incumpli-mientos de Bioculture, la meticulosidad, la prudencia y la protección del interés público por encima de un interés pri-vado, constituyen un acierto y no un error.
En resumen, para fines de los requisitos del Art. 28 de la Ley Núm. 76, supra, considero que el Tribunal de Ape-laciones actuó correctamente al confirmar el dictamen del foro primario. No existen justificaciones de peso para con-ceder un auxilio de jurisdicción ni revocar la sentencia del Tribunal de Apelaciones. Las consideraciones económicas y privadas que plantea Bioculture no me motivan a revocar un remedio provisional que protege al interés público. En atención a lo antes intimado, estoy conforme con el curso tomado por los compañeros y compañeras de la mayoría de este Tribunal.
r*H I — ! HH
Por las razones anteriormente expuestas, es mi criterio que no procede expedir el auto de certiorari en los casos de epígrafe ni paralizar el efecto del interdicto especial emitido.

 La Junta Revisora de Permisos y Uso de Terrenos es la sucesora para todos los fines legales de la Junta de Apelación sobre Construcciones y Lotificaciones. Sin embargo, en la relación de hechos se hará referencia a esta última porque era la que existía en el momento en que el caso se dilucidó. Art. 11.11 de la Ley Núm. 161-2009 (23 L.P.R.A. sec. 9021j).

 El procedimiento para impugnar construcciones y usos ilegales al amparo de la nueva Ley para la Reforma del Proceso de Permisos de Puerto Rico, Ley Núm. 161-2009 (23 L.P.R.A. secs. 9024-9024e), varía del dispuesto en el derogado Art. 28 de la Ley Núm. 76 de 24 de junio de 1975. Ahora se establece que toda querella se debe presentar ante el Inspector General. Si luego de la investigación éste decide ejercer sus facultades, puede solicitar la revocación del permiso o la paralización de obras o usos no autorizados, para lo cual deberá obtener una orden judicial. Ahora bien, si el inspector no actúa dentro del término de 15 días laborables, el querellante podrá acudir al tribunal a solicitar los remedios antes mencionados. Id.

 Ya que el señor Sanabria Morales satisface los requisitos de ser vecino, huelga analizar su legitimación activa en su capacidad de legislador municipal.